**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | No. 07-CR-1013-LRR |
| vs. | **SENTENCING MEMORANDUM** |
| CHARLES WARTHAN, a/k/a "Andrew," | |
| Defendant. | |

_____

## *I. INTRODUCTION*

The matter before the court is the sentencing of Defendant Charles Warthan, a/k/a "Andrew."

## *II. RELEVANT PROCEDURAL BACKGROUND*

On June 14, 2007, Defendant was charged in a one-count Indictment. Count 1 charged Defendant with Mail Fraud, in violation of 18 U.S.C. § 1341.[1]

---

[1] **§ 1341. Frauds and swindles**

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private

(continued...)

On July 27, 2007, Defendant appeared before United States Magistrate Judge Jon Stuart Scoles and pled guilty to the Indictment. On August 13, 2007, the undersigned accepted Defendant's guilty plea.

On December 31, 2007, the United States Probation Office ("USPO") filed Defendant's Presentence Investigation Report ("PSIR") and an Addendum thereto. On January 23, 2008, the government and Defendant filed their respective sentencing memoranda. On January 28, 2008, the USPO filed a Second Addendum to the PSIR.

On February 6, 2008, the court held a sentencing hearing ("Hearing"). Assistant United States Attorney Sean R. Berry represented the government. Assistant Federal Public Defender JoAnne Lilledahl represented Defendant, who was personally present.

At the Hearing, the court pronounced sentence in a manner consistent with the instant Sentencing Memorandum. The instant Sentencing Memorandum is designed to explain how the court resolved the three contested legal issues in the case. It is not comprehensive and should be read in conjunction with the record the court made at the Hearing.

### III. FACTUAL FINDINGS

The following facts regarding Defendant's offense of conviction and relevant

---

¹(…continued)
> or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined under this title or imprisoned not more than 20 years, or both . . . .

18 U.S.C. § 1341 (2006) (emphasis in original). Section 1341was amended in 2008, *see* Pub. L. 110-179, § 4, 121 Stat. 2557 (Jan. 7, 2008), however, such amendment is not relevant here.

conduct are undisputed:

### A. *Offense of Conviction*

In May of 2006, a man identifying himself as "Romel Chatman" of "Absolute Entertainment" contacted individuals, corporations and other organizations in Dubuque, Iowa, about a concert that he was promoting. "Chatman" indicated that the concert would feature a number of famous artists, including Ciara,[2] Chris Brown,[3] and Chamillionaire.[4] "Chatman" displayed an extensive knowledge of concert scheduling, promotion, radio terminology and music production.

"Chatman" contracted with a Dubuque radio station ("Radio Station") to advertise the concert. He made arrangements with the appropriate local officials to hold the concert at the Dubuque County Fairgrounds on June 30, 2006. He also arranged for law enforcement officers to provide security at the concert. Two Dubuque music and record stores ("Stores") agreed to sell tickets to the concert for $25 per ticket, cash only. "Chatman" printed 2,200 tickets (a total value of $55,000) and sent them to the Stores.

In June of 2006, the Stores began selling tickets to the concert. "Chatman" regularly called the Stores to check on the number of tickets sold and the amount of cash

---

[2] Ciara, a/k/a "Ciara Princess Harris," is perhaps most famous for her number-one hit single "Goodies" in 2004. *See* http://en.wikipedia.org/wiki/Ciara (last visited Feb. 5, 2008); *see also United States v. Bazaldua*, 506 F.3d 671, 673 n.2 (8th Cir. 2007) (taking judicial notice of article in Wikipedia, the online encyclopedia).

[3] Chris Brown, a/k/a "Chris Maurice Brown," "Chris Breezy," "Charlie Brown," "Sizzle" and "Pretty Boy" is perhaps most famous for his number-one hit single "Run It!" in 2005 and "Kiss Kiss" in 2007. *See* http://en.wikipedia.org/wiki/Chris_Brown_(singer) (last visited Feb. 5, 2008).

[4] Chamillionaire, a/k/a "Hakeem Seriki," "Chamillion," "Chamil," "Cham," "King Koopa," "The Mixtape Messiah," "The Truth From Texas," "Color Changin' Lizard," "Chamillionator," "Chamilitary Five Star General," "Chamilitary Mayne," is perhaps best known for his number-one hit single "Ridin.'" *See* http://en.wikipedia.org/wiki/Chamillionaire (last visited Feb. 5, 2008).

collected. He eventually made arrangements for Defendant to pick up the cash from the Stores.

On June 21, 2006, Defendant visited the Stores and collected approximately $18,000 in ticket proceeds. Defendant identified himself as "Andrew" to employees of the Stores.

On June 26, 2006, one of Chris Brown's representatives contacted the Radio Station and informed it that Chris Brown was not involved in the concert in any fashion. The radio station contacted law enforcement.

Meanwhile, "Chatman" continued to check up on ticket sales at the Stores. He made arrangements for Defendant to pick up more cash from the Stores.

On June 28, 2006, Defendant and another man, Jeffery Revis, went to the Dubuque music store to pick up cash. Defendant and Revis had traveled to Dubuque on a bus under the false names of "Damarcus Smith" and "Jay Schwab," respectively.[5] Defendant was wearing a tricky disguise: a wig, hat, glasses and finger braces on his hand. Law enforcement officers arrested Defendant and Revis. The owner of the Dubuque music store identified Defendant as "Andrew."

After his arrest, Defendant made a post-*Miranda* statement to law enforcement officers. Defendant admitted that he had sent a box of concert promotion materials to the Radio Station. The Radio Station received the materials via Federal Express on June 8, 2006. The materials included flyers, tickets and money orders. The money orders were payment for radio advertising. Records indicate that the Federal Express shipment originated in Atlanta, Georgia.[6]

---

[5] Defendant was a resident of Chattanooga, Tennessee.

[6] Two paragraphs in the PSIR reflect that Revis also made statements to law enforcement officers. *See* PSIR at ¶¶ 42-43. Defendant objected to such paragraphs, however, and the government did not present the court with any evidence at the Hearing.
(continued…)

4

On June 30, 2006, no promoter, artists or support staff showed up at the Dubuque County Fairgrounds for the concert. Four hundred seventy-two identifiable persons purchased tickets to the concert.

### B. Relevant Conduct

#### 1. *Indiana*

In March of 2005, a man identifying himself as "Bobby West" of "Bobby West Productions" called Catherine Gall, the manager of a retail store in Vigo County, Indiana. "West" told Gall that he was Lil' Flip's[7] concert promoter and asked her to sell tickets to a Lil' Flip concert to be held on the evening of April 2, 2005, at the Wabash Valley Fairgrounds. Gall agreed to sell tickets to the concert for $20 each, cash only.

West called Gall several times each day to see how many tickets she had sold at her store. On April 2, 2005, at approximately 2:30 p.m., "West" and Defendant went to the store with 69 tickets to sell. Defendant identified himself as Lil' Flip's "tour manager," "Charles Worthington." Between 4:30 p.m. and 5:00 p.m., "West" and Defendant returned to the store and collected $14,820 in ticket proceeds.

On April 1, 2005, Adeola Adediran, President of the Phi Beta Sigma fraternity at Indiana State University, made arrangements with "West" to have Lil' Flip perform at his fraternity party on April 2, 2005. The arrangements were made through multiple intermediaries, including a local disc jockey and Kelly Hipskind and Matt Easterling of

---

[6](…continued)
Accordingly, the court did not consider this portion of the PSIR. *See United States v. Carpenter*, 487 F.3d 623, 626 (8th Cir. 2007) (reiterating that an objected-to statement in a PSIR is not evidence).

[7] Lil' Flip, a/k/a "Wesley Eric Weston, Jr.," "is an American rapper known for his freestyle ability, and for becoming one of the first Houston rap artists to become mainstream and nationally known." http://en.wikipedia.org/wiki/Lil_Flip (last visited Feb. 5, 2008). "He is also a member of the Screwed Up Click." *Id.* The PSIR incorrectly refers to Lil' Flip as "'Lil Flip."

"partyonthenet.com."

On April 2, 2005, Adediran, Hipskind and Easterling went to the Wabash Valley Fairgrounds and met Defendant. Defendant introduced himself as Lil' Flip's "tour manager," "Charles Worthington." Adediran and Defendant signed a contract for Lil' Flip to perform at the fraternity party for $1,500. Adediran paid Defendant $1,500.

Defendant then asked Hipskind and Easterling to set up the stage for the concert and to sell tickets "at the door" for $25 each. Hipskind and Easterling agreed. Defendant also sold tickets "at the door" for $25 each. As the time for the concert neared, Defendant directed Hipskind and Easterling to stop selling tickets. Defendant, Hipskind and Easterling had sold approximately 200 tickets "at the door." Defendant collected all of the money from the ticket sales. Defendant announced that he was going to take a "smoke break," left the area and never returned.

### 2. *Texas*

On December 5 and 12, 2005, a man identifying himself as "Skip Stein" contacted Shannon Roach. Roach worked for KIXY, a radio station in San Angelo, Texas. "Stein" told Roach that he was planning a concert, the "Jingle Ball Jam," in San Angelo on December 30, 2005. "Stein" represented that Chris Brown, Ashanti[8] and Twista[9] would perform at the concert. "Stein" told Roach that he had arranged for two local ticket outlets, "Elite Physique" and "Rollerz Outlet," to sell tickets for the concert. "Stein" told Roach that he would send her via Federal Express a package containing $1,000 for

---

[8] Ashanti, a/k/a "Ashanti Shequoyia Douglas," is perhaps most famous for her Grammy Award-winning debut album *Ashanti*, which contained the top-ten songs "Foolish," "What's Luv" and "Always on Time." *See* http://en.wikipedia.org/wiki/Ashanti_singer (last visited Feb. 5, 2008).

[9] Twista, a/k/a "Carl Terrell Mitchell," "Tung Twista", "King of the Chi" is a rapper. In 1992, The Guinness Book of World Records named Twista the world's fastest rapper. See http://en.wikipedia.org/wiki/Twista (last visited Feb. 5, 2008).

6

advertising and free tickets to be given away on the air. Roach received such a package on December 13, 2005. The package contained two $500 money orders, 100 concert tickets, a copy of the commercials KIXY would produce and a concert flyer.

Meanwhile, in early December of 2005, "Stein" contacted Elite Physique and Rollerz Outlet. Elite Physique and Rollerz Outlet agreed to sell tickets to the concert for $25 per ticket, cash only. On December 13, 2005, Elite Physique received 1,400 tickets and 500 flyers via Federal Express. On December 12, 2005, Rollerz Outlet received a package from "Stein" that contained 1,400 tickets. Rollerz Outlet sold out of tickets, and Elite Physique transferred over 300 of its own allotment.

On December 27, 2005, "Stein" called Elite Physique and Rollerz Outlet and stated that his assistant, "Richard," would pick up the proceeds from the ticket sales. On December 28, 2005, Defendant arrived at Elite Physique. Defendant was wearing a hat and glasses and had a sling on his left arm. After being informed of security cameras, Defendant asked if he could pick up the ticket proceeds in an office. Elite Physique gave Defendant $11,700 generated from ticket sales. Defendant then went to Rollerz Outlet. Defendant wore khaki shorts, a dark blue long sleeved shirt, a brace on his left arm, a golf or derby hat and gold framed glasses. Defendant asked to do business in an office, and Rollerz Outlet provided him with $28,700 in cash from ticket sales.

On December 30, 2005, "Stein" called Roach and told her that the concert would need to be postponed, because there was a mix-up with the insurance. Roach never heard from "Stein" again, and the concert was cancelled.

In order to assuage its listeners and salvage its reputation in the community, KIXY refunded 2,095 tickets sold at $25 each for a total of $52,375. KIXY was, however, able to recover $11,155 in cash from Rollerz Outlet and $5,079 from Elite Physique from sales of tickets that occurred after Defendant collected the proceeds. KIXY suffered a total out-of-pocket loss of $36,141.

### 3. *Missouri*[10]

In June of 2006, Defendant was part of a failed ticket scam in Missouri that was intended to be similar to the ones in Iowa, Indiana and Texas. The precise level of Defendant's involvement in the attempted Missouri scam is unclear. Defendant admits, however, that he intended that his victims lose at least $88,000 in the Missouri scam.

## IV. SENTENCING FRAMEWORK

The Sentencing Guidelines are no longer mandatory. *See Kimbrough v. United States*, 128 S. Ct. 558, 574 (2007) (discussing *United States v. Booker*, 543 U.S. 220, 245 (2005). They are advisory. *Id.*

The Eighth Circuit Court of Appeals states that a "district court should begin [a sentencing proceeding] with a correct calculation of the advisory Sentencing Guidelines range." *United States v. Braggs*, No. 07-1148, 2008 WL 60180, *3 (8th Cir. Jan. 7, 2008). The advisory Sentencing Guidelines range "is arrived at after determining the appropriate Guidelines range and evaluating whether any traditional Guidelines departures are warranted." *United States v. Washington*, Nos. 06-3584 & 06-3954, 2008 WL 216597, at *3 (8th Cir. Jan. 28, 2008). "Then, after giving both parties a chance to argue for the sentence they deem appropriate, the court should consider all of the factors listed in 18 U.S.C. § 3553(a) to determine whether they support the sentence requested by either party." *Braggs*, 2008 WL 60180, at *3. "The district court may not assume that the Guidelines range is reasonable, but instead 'must make an individualized assessment based on the facts presented.'" *Id.* (quoting *United Stats v. Gall*, 128 S. Ct. 586, 597 (2007)).

---

[10] Paragraph 34 of the PSIR details the attempted Missouri concert scam and attributes $88,000 in "loss" to Defendant for purposes of the USPO's "loss" calculation under USSG §2B1.1(b)(1) (2007). *See* PSIR at ¶¶ 34, 47 & 53. Although Defendant initially objected to the allegations in Paragraph 34, he later withdrew his objection to the USPO's "loss" calculation. At the Hearing, Defendant expressly withdrew his objection to Paragraph 34.

"If the court determines that a sentence outside of the Guidelines is called for, it 'must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance.'" *Id*. "The sentence chosen should be adequately explained so as 'to allow for meaningful appellate review and to promote the perception of fair sentencing.'" *Id*.

## V. THE ISSUES

Much of the analysis concerning Defendant's advisory Sentencing Guidelines range was not in dispute at the Hearing. The parties agreed that Defendant's base offense level was **7**, pursuant to USSG §2B1.1(a)(1)(2007).[11] The parties agreed that Defendant was accountable for $234,320 in "loss" for purposes of USSG §2B1.1(b)(1), based upon his involvement in the Iowa, Indiana, Texas and Missouri concert scams. Therefore, a **twelve-level** increase to Defendant's base offense level was warranted, pursuant to USSG §2B1.1(b)(1)(G). The parties agreed that Defendant was responsible for more than 250 victims. Therefore, a **six-level** increase to Defendant's adjusted offense level was warranted, pursuant to USSG §2B1.1(b)(2)(C). The parties agreed that Defendant's scheme involved "sophisticated means." Therefore, a **two-level** increase to Defendant's adjusted offense level was warranted, pursuant to USSG §2B1.1(b)(9)(C). The parties agreed that Defendant was entitled to a **three-level** decrease for accepting responsibility, pursuant to USSG §3E1.1. Based on the foregoing, the parties agreed that Defendant's adjusted offense level was **24** before the court resolved any of the contested advisory Sentencing Guidelines issues. The parties further agreed that Defendant was a **Criminal History Category III**.

The parties litigated three advisory Sentencing Guidelines issues: whether the court should apply (1) a two-level reduction, pursuant to USSG §3B1.2(b), because Defendant

---

[11] The parties agree that the 2007 edition of the Sentencing Guidelines manual applies. *See* PSIR at ¶ 51.

was a minor participant in the criminal activity; (2) an upward departure, pursuant to USSG §5K2.0, because of the large number of victims of Defendant's criminal activity; and (3) a downward departure, pursuant to USSG §5K2.23, because Defendant had a discharged term of imprisonment.

## VI. ADVISORY SENTENCING GUIDELINES RANGE
### A. *Minor Participant—USSG §3B1.2(b)*

In relevant part, USSG §3B1.2(b) provides for a two-level decrease to a defendant's base offense level "[i]f the defendant was a minor participant in any criminal activity." USSG §3B1.2(b). This subsection "applies to a defendant . . . who is less culpable than most other participants, but whose role could not be described as minimal." *Id*. §3B1.2, cmt. (n.5). "The determination whether to apply [§3B1.2(b)] involves a determination that is heavily dependent upon the facts of the case." *Id*. cmt. (n.3(C)).

In a recent case, the Eighth Circuit Court of Appeals discussed §3B1.2 and stated:

> "A defendant may be eligible for the minor-role adjustment if his culpability is relatively minor compared to other participants, but the mere fact of lesser culpability does not entitle him to the reduction." *United States v. Lopez*, 414 F.3d 954, 961 (8th Cir. 2005); *United States v. Johnson*, 358 F.3d 1016, 1018 (8th Cir. 2004). "In cases in which the defendant is one of several participants in a conspiracy, he must show that his culpability was relatively minor compared to that of the other participants and that he was not deeply involved in the offense." *United States v. Lopez-Vargas*, 457 F.3d 828, 831 (8th Cir. 2006); *see United States v. Denton*, 434 F.3d 1104, 1115 (8th Cir.2006) ("A less culpable defendant is not entitled to reduction if he was 'deeply involved' in the offense").
>
> The "test for whether a reduction is appropriate is to compare the acts of the defendant 'in relation to the relevant conduct for which the participant is held accountable' and measure 'each participant's individual acts and relative culpability against the elements of the offense.'" *Gomez*

> *Godinez*, 474 F.3d at 1042-43 *quoting Johnson*, 408 F.3d at 538-39.

*United States v. Carpenter*, 487 F.3d 623, 626 (8th Cir. 2007).

Defendant bears the burden to prove that he is entitled to a decrease in his adjusted offense level for minor role. *Id.* "As with any other factual issue, the court, in weighing the totality of the circumstances, is not required to find, based solely on the defendant's bare assertion, that such a role adjustment is warranted." USSG §3B1.2 cmt. (n.3(C)).

Defendant argued that he had a minor role in the offense. He stated that his role in the concert scams was minor when compared to "Chatman"/"West"/"Stein" ("his coconspirator").[12] Defendant claims that his coconspirator had extensive knowledge of the concert industry and used such knowledge to further their scams. Defendant characterizes his own role as "minor" and states that he only picked up money and, in Indiana, posed as one of the artist's managers.

The government asserts that Defendant was deeply involved in all of the concert scams. The government points out that Defendant picked up all the proceeds from all the scams, wore disguises when doing so, and admitted he sent concert promotion materials to the Radio Station.

The court finds that Defendant has not met his burden to prove that he is entitled to a two-level role reduction under USSG §3B1.2(b). Defendant was deeply involved in the concert scams in Iowa, Indiana and Texas. Defendant picked up all of the proceeds from the scams. He wore tricky disguises. Defendant's conduct was not limited to picking up proceeds or wearing disguises, however. As part of the Iowa scam, Defendant sent a box of concert promotion materials to the Radio Station that played advertisements for the concert. The materials included flyers, tickets and money orders as payment for radio

---

[12] At the Hearing, the parties agreed that "Chatman," "Bobby West" and "Skip Stein" were the same person, Scott Elkins.

advertising. As a part of the Indiana scam, Defendant instructed others to set up the stage for the purported concert and to sell tickets "at the door" for $25 per ticket. He therefore enlisted others—albeit unwitting—to further the conspiracy. Defendant also personally sold tickets. As the time for the concert neared, Defendant directed the others to stop selling tickets. Defendant was not a minor participant in any of the criminal activity described in this case. Defendant and his coconspirator were equally culpable in each scam and the conspiracy as a whole.

Accordingly, the court declined to apply a two-level decrease, pursuant to USSG §3B1.2(b).

### B. Upward Departure for Large Number of Victims—USSG §5K2.0

In discussing the propriety of departures generally, the Eighth Circuit Court of Appeals recently summarized:

> Departures are appropriate if the sentencing court finds that there exists an aggravating or mitigating circumstance "of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that, in order to advance the objectives set forth in 18 U.S.C. § 3553(a)(2), should result in a sentence different from that described." USSG §5K2.0. The guidelines provide that sentencing courts [are] to treat each guideline as carving out a "heartland," a set of typical cases embodying the conduct that each guideline describes. When a court finds an atypical case, one to which a particular guideline linguistically applies but where conduct significantly differs from the norm, a court may consider whether a departure is warranted. USSG §1A1.1, cmt. (n.4(b)).

*United States v. Chase*, 451 F.3d 474, 482 (8th Cir. 2006) (formatting altered). The government bears the burden to prove that an upward departure is warranted. *See, e.g.*, *United States v. Fawbush*, 946 F.2d 584, 587 (8th Cir. 1991).

The decision whether to depart from the advisory Sentencing Guidelines rests within

the sound discretion of the district court. *See, e.g., United States v. Thin Elk*, 321 F.3d 704, 707-08 (8th Cir. 2003) (reviewing for an abuse of discretion "because the decision to depart embodies the traditional exercise of discretion by the sentencing judge" (citations and internal quotation marks omitted)). However, "[b]efore a departure is permitted, certain aspects of the case must be found unusual enough for it to fall outside the heartland of cases . . . ." *Koon v. United States*, 518 U.S. 81, 98 (1996). The district court must "carefully articulate the reasons for departure, particularly where the waters are unchartered." *United States v. Reinke*, 283 F.3d 918, 925-26 (8th Cir. 2002) (citing *Koon*, 518 U.S. at 95)).

The government asserted that an upward departure was appropriate, because of the large number of victims of Defendant's criminal conduct. The government estimated the number of victims to be "at least 1,500 actual victims and up to 2,200 intended victims" when all relevant conduct is considered. Sentencing Memorandum (docket no. 17), at 4. The government argued that Defendant's six-level increase under §2B1.1(b)(2)(C) does not adequately take into consideration Defendant's conduct toward all of these victims. The government pointed out that Defendant was scored as many levels under §2B1.1(b)(2)(C) as a defendant with only 250 victims.

Defendant disagreed with the government's estimation of the number of victims of Defendant's criminal conduct. Further, Defendant pointed out that only victims who suffered actual loss may be counted under §2B1.1. Defendant also asserted that *United States v. Icaza*, 492 F.3d 967 (8th Cir. 2007), requires that the court only consider "identifiable" victims when counting victims for purposes of §2B1.1. Defendant pointed out that, in fashioning incremental two-level adjustments under §2B1.1, the Sentencing Commission recommended an enhancement by two levels whenever the number of victims increases five-fold. Although Defendant did not state the precise number of victims of his criminal conduct, he suggested that a sentence in the middle of the range was more

appropriate than an upward departure; he implied that an upward departure would be most appropriate only when the number of actual, identifiable victims exceeds 1,250 victims.

After considering the arguments of the parties, the court found that this case fell outside the "heartland." Section 2B1.1 provides for a two-level increase where there are 10 or more victims, USSG §2B1.1(b)(2)(A), a four-level increase where there are 50 or more victims, *id.* §2B1.1(b)(2)(B), and a six-level increase where there are 250 or more victims, *id.* §2B1.1(b)(2)(C). "'Victim' is defined as '(A) any person who sustained any part of the actual loss determined under subsection (b)(1); or (B) any individual who sustained bodily injury as a result of the offense.'" *Id.* cmt. (n.1). "'Person' includes individuals, corporations, companies, associations, firms, partnerships, societies, and joint stock companies." *Id.* Here, Defendant's base offense level was increased six levels, because his criminal activity involved 472 identified victims in the Iowa scam. *See* USSG §2B1.1(b)(2)(C). Each of these individuals suffered an actual loss.

The court agrees with Defendant insofar as he argues that only persons who sustain actual loss count as "victims" under §2B1.1 (leaving aside individuals who sustain bodily injury, of which there is no evidence here). *See* USSG §2B1.1 cmt. (n.1). This conclusion, however, lends support for the government's argument for an upward departure: the advisory Sentencing Guidelines do not capture the large number of intended victims in this case apart from the 250 victims suffering actual losses in Iowa that triggered the six-level increase under §2B1.1.[13] Specifically, the advisory Sentencing Guidelines

---

[13] Defendant's argument that *Icanza* only permits the court to count "identifiable" victims for purposes of §2B1.1 lacks merit. Nothing in §2B1.1 or the Commentary thereto commands such a conclusion. So long as the court knows that a victim suffered actual loss or sustains a bodily injury, it is irrelevant that the court does not know that victim's name. In any event, if Defendant's narrow interpretation of §2B1.1 were valid, it would only provide yet another reason for an upward departure.

fail to capture the large number of additional victims he intended in Texas and Missouri.[14]

Accordingly, the court departed upward **two levels** pursuant to USSG §5K2.0. This brought Defendant's adjusted offense level to **26**.

### C. *Downward Departure—USSG §5K2.23*

In its entirety, USSG §5K2.23 provides:

> **§ 5K2.23. Discharged Terms of Imprisonment (Policy Statement)**
> A downward departure may be appropriate if the defendant (1) has completed serving a term of imprisonment; and (2) subsection (b) of § 5G1.3 (Imposition of a Sentence on a Defendant Subject to Undischarged Term of Imprisonment) would have provided an adjustment had that completed term of imprisonment been undischarged at the time of sentencing for the instant offense. Any such departure should be fashioned to achieve a reasonable punishment for the instant offense.

USSG §5K2.23 (emphasis in original). The Eighth Circuit Appeals, in its only decision to discuss §5K2.23, stated that the district court may not depart downward under such section unless Defendant proves two elements: (1) "the term of imprisonment 'resulted from another offense that is relevant conduct to the instant offense of conviction' under the provisions of [USSG §1B1.3]," and (2) "that the relevant conduct 'was the basis for an increase in the offense level for the instant offense under Chapter Two (Offense Conduct) or Chapter Three (Adjustments).'" *United States v. Parker*, Nos. 06-3607 & 06-3650, 2008 WL 141157, *3 (8th Cir. Jan. 16, 2008). Even then, the decision to depart remains discretionary. *See* USSG §5K2.23 (using the permissive word "may").

Here, the PSIR reflects that, on May 3, 2007, Defendant completed a 115-day term of imprisonment in Indiana state court for his role in the Indiana scams. *See* PSIR at ¶ 71.

---

[14] To avoid any potential conflict with the court's decision to not depart downward pursuant to USSG §5K2.23, *see infra* Part V.C, the court did not consider the intended victims in Indiana.

Defendant meets the first prong of §5K2.23, because Defendant's actions in the Indiana scam were clearly relevant conduct to the offense of conviction. USSG §1B1.3. The fighting issue is whether Defendant meets the second prong.

Defendant's offense level was increased under Chapter Two pursuant to three provisions; Defendant's offense level was not increased under Chapter Three. Defendant's offense level was increased under Chapter Two (1) pursuant to USSG §2B1.1(b)(1)(G), because he caused a loss between $200,000 and $400,000; (2) pursuant to USSG §2B1.1(b)(2)(C), because his offense involved more than 250 victims; and (3) pursuant to USSG §2B1.1(b)(9)(C), because such offense involved a "sophisticated means." The government argued that Defendant's relevant conduct in Indiana was not the basis for any of these three increases. Defendant generally asserted that he was entitled to a downward departure without any analysis.

The court finds that Defendant's relevant conduct in Indiana was not "the basis" for any of his Chapter Two adjustments. USSG §5K2.23. With respect to USSG §2B1.1(b)(1)(G), Defendant would have received a twelve-level increase for amount of loss regardless of whether any loss in Indiana was counted. Defendant admitted he should be assessed $70,000 in loss for the Texas scam, $88,000 for the Missouri scam, $55,000 for the Iowa scam and $21,320 for the Indiana scam. Even if the $21,320 in loss for the Indiana scam were not counted, Defendant would have still met the $200,000 threshold necessary for a twelve-level increase.

Similarly, with respect to USSG §2B1.1(b)(2)(C), Defendant would have received the six-level increase regardless of whether any victims in Indiana were counted. Defendant had 472 victims in Iowa alone. Therefore, any victims in Indiana were not "the basis" for an increase under Chapter 2. USSG §5K2.23.

Lastly, with respect to USSG §2B1.1(b)(9)(C), all of Defendant's scams involved "sophisticated means." Accordingly, Defendant has not proven that the use of

16

"sophisticated means" in Indiana was "the basis" for a Chapter Two increase to his offense level. USSG §5K2.23.

In any event, even if Defendant had shown that relevant conduct were somehow "the basis" for an increase to Defendant's offense level, the court would decline to depart downward. No such departure could be fashioned to achieve a reasonable punishment for the instant offense. USSG §5K2.23.

Accordingly, the court declined to depart downward pursuant to USSG §5K2.23.

### VI. DISPOSITION

After all applicable adjustments and departures, the court found that Defendant's total offense level was **26**. The court also found that Defendant was a **Criminal History Category III**. Accordingly, the court found that Defendant's advisory Sentencing Guidelines range was **78 to 97 months of imprisonment**. *See* USSG Sentencing Table. At the Hearing, the court sentenced Defendant in a manner consistent with the instant Sentencing Memorandum.

**IT IS SO ORDERED.**

**DATED** this 7th day of February, 2008.

_____
LINDA R. READE
CHIEF JUDGE, U.S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA